| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 07 CR 689 |
| | ) | |
| MARK DAVID RADLEY, | ) | Judge Ruben Castillo |
| JAMES WARREN SUMMERS, | ) | |
| CODY DEAN CLABORN, and | ) | |
| CARRIE KIENENBERGER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this novel criminal case, the government charges Mark David Radley ("Radley"),

James Warren Summers ("Summers"), Cody Dean Claborn ("Claborn") and Carrie Kienenberger

("Kienenberger") (collectively "Defendants"), with conspiring to corner the market and

manipulate the price of propane in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C.

§ 1, *et seq.*, and other federal laws.  (R. 1, Indictment.)  Defendants move to dismiss the

indictment for lack of venue, or, alternatively, for a transfer of venue to the Southern District of

Texas.  (R. 62, Defs.' Am. Mot. to Dismiss; R. 59, Defs.' Mot. to Transfer.)  For the following

reasons, the motion to dismiss is denied, and the motion to transfer is granted.

### RELEVANT FACTS[1]

BP America, Inc. and BP Products North America Inc. (collectively "BP") are based in

Warrenville, Illinois.  (R. 1, Indictment ¶ 4.)  Defendants are all former employees of a BP

---

[1] When deciding a pre-trial motion to dismiss, the Court assumes all facts in the Indictment to be true and views those facts in the light most favorable to the government.  *United States v. Segal*, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004).

subsidiary and were assigned to the Integrated Supply & Trading ("IST") group, BP's world-wide trading business. (R. 1, Indictment ¶ 4.) Within IST, the trading of natural gas liquids in the United States was conducted by the Natural Gas Liquids ("NGL") trading bench (the "NGL Trading Bench"), located in Houston, Texas. (*Id.* ¶¶ 4-5.)

One of the NGLs handled by the NGL Trading Bench was propane transported in the Texas Eastern Products Pipeline Company, LLC ("TEPPCO") interstate pipeline system, known as "TET propane." (*Id.* ¶¶ 1, 4-5.) TET propane is a "commodity" as defined by the CEA, 7 U.S.C. § 1a(4). (*Id.* ¶ 13.) Propane is used by petrochemical industries to produce plastics, and is also used as a source of energy for residential and commercial purposes. (*Id.* ¶ 13.) Residential and commercial consumption of propane is greatest in the Northeast and Midwest sections of the United States, including Chicago.[2] (*Id.*) The NGL Trading Bench traded TET propane with other companies, referred to as "counter-parties," throughout the United States. (*Id.* ¶ 5.) Radley was the "bench leader" of the NGL Trading Bench, and his duties included the development and oversight of trading strategies. (*Id.* ¶ 7.) Summers was a Vice President of NGLs and Radley's supervisor. (*Id.* ¶ 8.) Claborn was the primary trader on the NGL Trading Bench responsible for trading TET propane during 2003 and 2004. (*Id.* ¶ 9.) Kienenberger was a trader on the NGL Trading Bench who traded TET propane during February 2004. (*Id.* ¶ 10.) Defendants were commonly granted year-end bonuses, based in part on the trading profits of the NGL Trading Bench. (*Id.* ¶ 6.)

---

[2] According to the General Accounting Office ("GAO"), 4.6 million households in the United States use propane to heat their homes, and millions more use it to cook and/or heat their water. (R. 64, Defs.' Mem. in Supp. of Mot. to Dismiss, Ex. I, GAO Report 03-762, *Propane: Causes of Price Volatility, Potential Consumer Options, and Opportunities to Improve Consumer Information and Federal Oversight*, at 1.)

TET propane was predominantly traded over-the-counter in one of three ways: (a) directly between two parties; (2) through "voice brokers," whereby brokers negotiated and executed deals on behalf of a buyer and seller; and (3) through an electronic trading platform known as "Chalkboard," in which buyers and sellers posted anonymous bids and offers on an electronic website, and would learn the counter-party's identity only upon completing a transaction. (Id. ¶ 14.) After a trade was executed, a confirmation notice was sent to the counter-party via the mail and interstate wire systems between BP's offices in Texas or Illinois and the various counter-parties' offices in Texas, Illinois, or elsewhere. (Id. ¶ 5.) Funds from the Defendants' sales of TET propane were transmitted by counter-parties via the mail and interstate wire systems to a BP bank account in Chicago. (Id. ¶ 5.)

As part of their alleged scheme, Defendants used the financial resources of BP to buy contracts for delivery of large amounts of TET propane at the end of February 2004, despite the fact that BP had no commercial need for the propane, in order to make BP the dominant owner of February 2004 TET propane.[3] (Id. ¶¶ 2, 36.) Defendants allegedly exploited their dominant market power by continuing to purchase large quantities of February 2004 TET propane throughout the month, withholding February 2004 TET propane from the market, and using bidding tactics that were intended to artificially inflate the price of February 2004 TET propane. (Id. ¶¶ 2, 23-47.) The government alleges that through their actions, Defendants, along with others, cornered the market for February 2004 TET propane and sold the propane at prices that were artificially inflated. (Id. ¶¶ 2, 44.)

---

[3] "February 2004 TET propane" means propane deliverable to the TET propane storage facility in Mont Belvieu, Texas, during February 2004. (R. 64, Defs.'s Mem. in Supp. of Mot. to Dismiss at 5.)

3

Defendants are further alleged to have inflated the industry benchmark price of February 2004 TET propane through their conduct. (*Id.* ¶ 3.) During the relevant period, the Oil Price Information Sheet ("OPIS") published prices for various types of propane, including TET propane. (*Id.* ¶ 15.) OPIS published daily and monthly average prices based on information collected daily from market participants. (*Id.*) The OPIS daily average consisted of the unweighted mean between the lowest and highest reported transaction prices on a given day. (*Id.*) OPIS prices published for TET propane affected the price paid by commodity traders and end-users of propane in the Midwest and Northeast. (*Id.* ¶ 16.) Defendants allegedly sold February 2004 TET propane to counter-parties throughout the United States at the artificially inflated index price, thus defrauding them. (*Id.* ¶¶ 3, 17, 27.) Companies A through P, among others, purchased February 2004 TET propane from BP. (*Id.* ¶ 17.) On or about February 27, 2004, Company D, which is located within the Northern District of Illinois, purchased 5,000 barrels of February 2004 TET propane from BP at an artificially inflated price. (*Id.* ¶ 44(d).)

## PROCEDURAL HISTORY

On October 25, 2007, Defendants were charged in a twenty-count Indictment.[4] (R. 1.) Count 1 charges the Defendants with conspiracy to violate the CEA, 7 U.S.C. § 13(a)(2), and to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (*Id.* ¶¶ 18-49.) Counts 2-13 charge Defendants with manipulating and attempting to manipulate the price of February

---

[4] In June 2006, the U.S. Commodity Futures Trading Commission ("CFTC") brought a civil action against BP based on the same conduct underlying this criminal case, seeking a civil monetary penalty and other relief. *See CFTC v. BP Prod. N. Am., Inc.,* No 06-3503, 2007 WL 3407430 (N.D. Ill. Oct. 25, 2007). In October 2007, BP consented to entry of judgment and agreed to, among other relief, the implementation of a compliance and ethics program; the appointment of an independent monitor for a three-year period; and the payment of a $125 million civil penalty. *Id.*

4

2004 TET propane, and cornering and attempting to corner the market of February 2004 TET propane in violation of the CEA, 7 U.S.C. § 13(a)(2). These violations allegedly culminated in the receipt of funds in BP's Chicago bank account from twelve separate trades, including the trade with Company D, located within the Northern District of Illinois. (*Id.* ¶¶ 50-51.) Counts 14-20 charge Defendants with seven separate acts of wire fraud, in violation of 18 U.S.C. § 1343. (*Id.* ¶¶ 52-54.)

## ANALYSIS

Defendants move to dismiss the Indictment, arguing that "venue is improper here because the acts underlying the allegations in the Indictment occurred in the Southern District of Texas and not in the Northern District of Illinois." (R. 62, Defs.' Am. Mot. to Dismiss at 2.)[5] Defendants argue that maintaining the case in this District would violate Article III of the U.S. Constitution and their Sixth Amendment right to be tried in the District where their crimes were allegedly committed. (*Id.* at 1.) In a separate motion, Defendants alternatively argue that the Court should exercise its discretion to transfer the case to the Southern District of Texas pursuant to Federal Rule of Criminal Procedure 21(b) for the convenience of the parties and witnesses. (R. 59, Defs.' Mot. to Transfer at 1-2.)

The government objects to both motions. (R. 78, Gov't Resp. to Mot. to Dismiss; R. 79, Gov't Resp. to Mot. to Transfer.) As to the motion to dismiss, the government argues that constitutional venue requirements are satisfied in this District because, in essence, "Defendants'

---

[5] Defendants originally filed a motion to dismiss and accompanying memorandum of law on January 2, 2008. (R. 56-58.) On January 4, 2008, the Court permitted Defendants to voluntarily withdraw their motion and memorandum and to file the amended motion to dismiss and amended memorandum presently pending before the Court. (R. 62-65.)

criminal conduct began and ended with the financial transactions that occurred in this District." (R. 78, Gov't Resp. to Mot. to Dismiss at 1.) The government additionally argues that a discretionary transfer to the Southern District of Texas is not warranted, and that such a transfer would cause undue hardship to the government. (R. 79, Gov't Resp. to Mot. to Transfer.)

## I.    Defendants' Motion to Dismiss

Article III of the U.S. Constitution provides that criminal trials "shall be held in the state where said Crimes shall have been committed." U.S. CONST. Art. III, § 2. Similarly, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." U.S. CONST. amend VI. These constitutional venue guarantees are more than procedural technicalities; they "touch closely the fair administration of criminal justice and public confidence in it" and "raise deep issues of public policy." *United States v. Mohammad*, 502 F.3d 646, 652 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1104 (U.S. Jan. 14, 2008). One such policy concern is "the protection of a defendant from prosecution in a place far from his home and the support system that is necessary to mount an adequate defense." *Id.* Rule 18 of the Federal Rules of Criminal Procedure provides for the practical application of these constitutional guarantees, stating, "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

Because of these constitutional guarantees, the government bears the burden of proving that the defendant's crime occurred in the District charged. *Muhammad*, 502 F.3d at 652; *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000); *see also United States v. Massa*, 686 F.2d 526, 527 (7th Cir. 1982) ("Proof of venue is an essential element of the Government's case.").

Venue is not an element of the offense, however, and so the government need only prove venue by a preponderance of the evidence, and may do so with either direct or circumstantial evidence. *Muhammad*, 502 F.3d at 652. In deciding whether there is proper venue, the Court views the evidence in the light most favorable to the government. *Ochoa*, 229 F.3d at 636. When a defendant is charged with more than one count, venue must be proper with respect to each count. *United States v. Tingle*, 183 F.3d 719, 726 (7th Cir. 1999).

In determining whether constitutional venue requirements are satisfied, the Court first must look to whether there is a statutory directive on venue. *Muhammad*, 502 F.3d at 652. In their motion, Defendants argue that venue is improper as to the commodities offenses, and thus the statute the Court must look to is the CEA.[6] (R. 64, Defs.' Mem. in Supp. of Mot. to Dismiss at 2; R. 82, Defs.' Reply in Supp. of Mot. to Dismiss at 1.) The CEA contains the following venue provision: "Any action under this section may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur . . . ." 7 U.S.C. § 13a-1(e). The government argues that under this provision venue is proper in this District. (R. 78, Gov't Resp. to Mot. to Dismiss at 10-11.) As Defendants point out, however, this venue provision appears in Section 13a-1, which applies to *civil* actions brought by the Commodity Futures Trading Commission ("CFTC"), not in Section 13, the criminal portion of the CEA under which the government is proceeding here. There is no venue provision contained in Section 13, and the venue provision

---

[6] Defendants argue by extension that because venue is improper as to the commodities offenses, the conspiracy count is also defective because it charges Defendants in part with conspiring to violate the CEA. (R. 82, Defs.' Reply in Supp. of Mot. to Dismiss at 1 n. 1). Defendants do not challenge venue for the wire fraud offenses. (*Id.* at 6, 10 n.11.)

contained in Section 13a-1 states that it applies to actions brought under that "section."[7] 7 U.S.C.

§ 13a-1(e). Nor is it apparent that the broad venue provision contained in Section 13a-1 should

apply outside of the civil context, given the constitutional constraints on venue contained in

Article III and the Sixth Amendment that apply in criminal cases. Indeed, the only cases

applying the venue provision contained in Section 13a-1(e) are civil cases brought by the CFTC.

*See, e.g., CFTC v. Savage*, 611 F.2d 270 (9th Cir. 1979); *CFTC v. Worldwide Commodity Corp.*,

366 F. Supp. 2d 276 (E.D. Pa. 2005). In the entire history of the CEA, there has apparently been

only one other criminal prosecution for price manipulation (stemming from California's

electricity crisis in the summer of 2000), and in that case the defendants did not challenge venue.[8]

*See United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1054 (N.D. Cal. 2006)

(observing that "in the 68 years since commodity manipulation was made a crime, there has

never been a reported criminal prosecution—until now"). Given the lack of clarity in the law, the

Court finds no clear statutory directive on venue and thus proceeds to the second part of the

analysis.

In the absence of a statutory directive on venue, the Court must consider: (1) the "nature

---

[7] By contrast, the Securities Exchange Act has a venue provision that specifically addresses both civil actions and criminal proceedings, *see* 15 U.S.C. § 78aa, suggesting that Congress knows how to provide for venue in criminal cases if it wishes to do so.

[8] The former chief counsel of the CFTC's enforcement division has opined that criminal prosecutions for price manipulation are few and far between because such crimes are "virtually unprosecutable" under present laws. Jerry W. Markham, *Manipulation of Commodity Futures Prices: The Unprosecutable Crime*, 8 YALE J. REG. 281, 282 (1991). In his view, investigating and prosecuting market manipulation offenses involves years of work and enormous expenditures; further, it is often impossible to prove that prices were inflated through intentional conduct by the defendants as opposed to outside factors, since prices fluctuate constantly in the futures market. *Id.* at 283-84.

of the crime alleged"; and (2) "the location of the act or acts constituting it." *Muhammad*, 502

F.3d at 652. These factors are intended to be a "general guide" and not a "rigid test." *Id.* In

considering the first factor, the nature of the crime alleged, the Court must examine the "key

verbs" in the statute defining the criminal offense to determine the scope of the relevant conduct.

*Id.* at 652-53. Here, Defendants are charged with violating Section 13(a)(2) of the CEA, which

makes it a felony for "[a]ny person to manipulate or attempt to manipulate the price of any

commodity in interstate commerce . . . or to corner or attempt to corner any such

commodity . . . ." 7 U.S.C. § 13(a)(2). The key verbs are "manipulate" and "corner." These

terms are not defined in the CEA, and so the task of defining them has been left to the courts.[9]

The Seventh Circuit has defined "manipulation" as "an intentional exaction of a price determined

by forces other than supply and demand." *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991).

"Cornering" occurs "when a trader secretly acquires a long futures position, very large relative to

the physical supply that is available to be delivered, and simultaneously acquires the means, by

ownership or otherwise, to prevent delivery at reasonable prices of the physical commodity,

thereby 'squeezing' the shorts that must make delivery." *Zimmerman v. CBOT*, 360 F.3d 612,

616 (7th Cir. 2004).

Applying those definitions here, it is apparent that some of Defendants' wrongful conduct

occurred in this District. Although Defendants' alleged plan to corner the TET propane market

began with discussions that occurred in Houston, it was carried out through a series of trades,

---

[9] Congress' decision to prohibit price manipulation without defining the term may have stemmed from a concern that "clever manipulators would be able to evade any legislated list of proscribed actions or elements of such a claim." *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995).

telephone calls, wire transfers, and transportation of TET propane that crossed numerous states, including Illinois. "[W]here the acts constituting the crime and the nature of the crime charged implicate more than one location, the constitution does not command a single exclusive venue." *Muhammad*, 502 F.3d at 654 (citation omitted); *see also United States v. Johnson*, 510 F.3d 521, 524 (4th Cir. 2007) ("It is well-accepted that there may be more than one appropriate venue, or even a venue in which the defendant has never set foot, so long as it meets the relevant constitutional and statutory requirements."); *United States v. Frederick*, 835 F.2d 1211, 1215 (7th Cir. 1987) ("Proper venue is not limited to districts where the defendants were physically present when they committed unlawful acts.") Specific to this District, the Indictment alleges that the trades Defendants made in furtherance of their plan to gain control of the TET propane supply resulted in the wire-transfer of millions of dollars to a bank account in Chicago; Defendants sold propane to numerous companies throughout the country at artificially inflated prices, including Company D, located within this District; Defendants conducted their sales on behalf of a BP subsidiary with an address in this District; and Defendants' actions affected TET propane prices throughout the country, including those paid by end-users in this District. (R. 1, Indictment ¶¶ 5, 16-17, 23-53.) The nature of Defendants' offenses thus has a connection to this District.

The Court must next consider the "location of the act or acts constituting the crime in question." *Muhammad*, 502 F.3d at 653. In doing so, the Court bears in mind that "an overly mechanistic approach to the location of the defendant's acts may limit unrealistically the permissible venues in terms of the policy concerns that underlie the constitutional venue guarantee." *Id.* at 654. Further, "places that suffer the effects of a crime are entitled to

10

consideration for venue purposes." *Id.* In *Muhammad*, for example, the Seventh Circuit found constitutional venue requirements satisfied in the Eastern District of Wisconsin, even though defendant's criminal activity occurred in Phoenix and Texas. *Id.* The defendant, a Wisconsin resident, went to Phoenix to obtain a large amount of cocaine, which he allegedly planned to distribute in Wisconsin; he never made it, however, because he was stopped by police in Texas and arrested when they found three kilograms of cocaine in the trunk of his car. *Id.* In finding constitutional venue requirements satisfied in Wisconsin, the Seventh Circuit found it significant that the defendant "drew upon resources from the Eastern District of Wisconsin" and that his actions were intended to have an effect in that District. *Id.*; *see also United States v. Ringer*, 300 F.3d 788, 791-92 (7th Cir. 2002) (venue proper in Indiana because witness in Kentucky made false statements intended to influence government investigation pending in Indiana); *Frederick*, 835 F.2d at 1213-15 (in witness tampering case, venue was proper in Illinois where underlying criminal case was pending since effects were felt there, even though the witness tampering actually occurred in Florida).

Here, Defendants are alleged to have drawn upon the substantial financial resources of BP, which is headquartered in this District, to carry out their plan to control the supply of TET propane; Defendants are also alleged to have conducted numerous trades in furtherance of their plan on behalf of a BP subsidiary with an address in this District; and Defendants used a bank account in Chicago to maintain millions of dollars obtained from their trades. (R. 1, Indictment ¶¶ 2, 23-47.) Defendants' conduct is also alleged to have had an effect here, because at least one company in this District purchased propane from Defendants at artificially inflated prices, and the artificially inflated index price of TET propane allegedly caused by Defendants' wrongful

11

conduct affected end-users of propane in this District.  (R. 1, Indictment ¶¶ 13-17.)

As the Seventh Circuit has observed, "venue rules must be sufficiently malleable to accommodate the reality that criminal activity may implicate many locations." *Muhammad*, 502 F.3d at 654.  For crimes that occur in more than one state or District, venue is constitutionally and statutorily proper in any District in which part of the crime was committed.  18 U.S.C. § 3237(a) ("[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."); *see also Ochoa*, 229 F.3d at 636 (citing 18 U.S.C. § 3237).  Under Section 3237, venue may be proper in numerous Districts, and will only be improper in a particular District if the acts that occurred in that District do not provide evidence of the elements of the crime charged.  *See Ringer*, 300 F.3d at 792; *Ochoa*, 229 F.3d at 636.

The elements of price manipulation are: (1) the defendant possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price.[10]  *Frey*, 931 F.2d at 1177-78. Cornering, which is essentially an extreme form of price manipulation, has the following elements: (1) the defendant holds a controlling dominant long position in the market; (2) the defendant specifically intends to execute a squeeze; (3) an artificial price existed at the time of

---

[10] *Frey* was a civil action brought by the CFTC rather than a criminal case, but this Court can discern no reason (nor have the parties provided any) why the elements of a violation of Section 13 would differ here, although the government would have a higher burden of proof in this criminal case.  As noted above, there is a paucity of case law addressing commodities price manipulation or cornering in the criminal context; in the only other criminal case brought for price manipulation, the court adopted the *Frey* elements.  *See Reliant Energy Servs.*, 420 F. Supp. 2d at 1056.

the offense; and (4) the defendant caused the artificial price. *Id.* at 1175; *see also Zimmerman*, 360 F.3d at 616 (defining a "corner"). Although proving price manipulation and cornering will require inquiry into the conversations that allegedly occurred among the Defendants in Houston, also relevant will be the numerous trades Defendants conducted to garner control over the supply of TET propane, using BP funds and made on behalf of a BP subsidiary located in this District. These trades resulted in millions of dollars being wire-transferred to this District, and involved at least one counter-party located in this District. Even though venue for Defendants' commodities offenses would no doubt be permissible in the Southern District of Texas, "the fact that other venues are appropriate certainly does not preclude the possibility that the present one . . . is also a constitutionally appropriate venue." *Muhammad*, 502 F.3d at 654. Because part of the commodities offenses occurred in this District, venue is proper under Section 3237(a).

For these reasons, the Court concludes that constitutional venue requirements are satisfied in this District.

## II.    Defendants' Motion to Transfer

Defendants alternatively move for a discretionary transfer to the Southern District of Texas pursuant to Federal Rule of Criminal Procedure 21. (R. 59, Defs.' Mot. to Transfer.) Rule 21 provides: "Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice." Fed. R. Crim. P. 21. Whether to transfer a case under Rule 21 is a decision left to the Court's discretion. *United States v. Morrison*, 946 F.2d 484, 489 (7th Cir. 1991). Consideration of a motion to transfer "is one of those areas in which the question for the court of appeals is whether the discretion granted to the district court has been

exercised." *United States v. Jordan*, 223 F.3d 676, 686 (7th Cir. 2000). "If it has been, it will be almost impossible to show that it has been abused." *Id.*

The Court may transfer a criminal case "if, all relevant things considered, the case would be better off transferred to another district." *In re Balismo*, 68 F.3d 185, 187 (7th Cir. 1995). The factors to be considered are: (1) the location of the defendants; (2) the location of possible witnesses; (3) the location of events likely to be in issue; (4) the location of documents and records likely to be involved; (5) possible disruption of defendants' business unless the case is transferred; (6) the expense to the parties; (7) the location of counsel; (8) the relative accessibility of the place of trial; (9) the docket condition of each district involved; and (10) any other special factors which might affect the transfer. *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243-245 (1964). "No one of these considerations is dispositive. . . . It remains for the district court to try to strike a balance and determine which factors are of greatest importance." *Morrison*, 946 F.2d at 490 n.1 (citation omitted).

### 1.    Location of Defendants

As to the first factor, the documents before the Court show that three of the four defendants—Summers, Claborn, and Kienenberger—live in the Houston area. (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 3, 6-7.) Summers has three young children. (*Id.* at 7.) Claborn has an extended support network in Houston, including his parents, siblings, and three teenage children, and is being treated for depression by a doctor in the Houston area. (*Id.* at 7.) Radley previously resided in Houston, but "[d]ue to the harm to his livelihood resulting from the investigations, accusations, and adverse publicity" arising from this criminal case, he and his family are presently residing with his in-laws in Illinois. (*Id.* at 3.) As the government points

out, there is no constitutional right to trial in one's home district. *United States v. Zylstra*, 713 F.2d 1332, 1336 (7th Cir. 1983). Nevertheless, there can be little dispute that a trial in Houston would be more convenient for the Houston-based Defendants and their families. *See United States v. Lima*, No. 94-800, 1995 WL 348105, at *2 (N.D. Ill. Jun. 1, 1995) (where defendant's home and office were located within an hour of the New Jersey district courthouse, transfer to New Jersey "would cause less disruption of his family life"). The Court finds that this factor weighs significantly in favor of a transfer, at least as to three of the four defendants.[11]

### 2.  Location of Possible Witnesses

This case has not yet been set for trial, and discovery is ongoing. At present, the government states that it anticipates calling approximately 15 witnesses in its case in chief, assuming Defendants "will agree to reasonable stipulations." (R. 79, Gov't Resp. at 7 n.5.) The 18-month criminal investigation that led to this case was conducted jointly by the Chicago division of the Federal Bureau of Investigation ("FBI") and the U.S. Postal Inspection Service in Washington D.C., and was handled primarily by three case agents: two Chicago-based FBI agents and a Postal Inspector who is based in New Jersey and Washington, D.C. (*Id.* at 7.) The government asserts that the bulk of its case at trial will be presented by these three case agents. The government anticipates calling four other Chicago-area witnesses. Three more of its witnesses live in Houston, and there are other witnesses located in New York, California, Washington D.C., Canada, London, and other cities in the Northeast and Midwest. (R. 79, Gov't Resp. at 7-8.)

---

[11] Defendants have not provided the Court with any analysis of how a Houston-based trial would affect Radley or his family.

Defendants do not agree that the trial will be so straightforward. In their view, the trial will require numerous fact witnesses, including traders, schedulers, and analysts who worked on or with the NGL Trading Bench, almost all of whom are located in Houston.[12] (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 9-10; R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 6-8 & Ex A.) Defendants assert that all the trades at issue involved counter-parties, and most of them employed traders, many of whom are based in Houston.[13] (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 7.) The electronic trading platform, Chalkboard, which Defendants allegedly used to conduct their manipulative bidding practices in secret, is owned and maintained by a company in Houston. (*Id.*; R. 64, Defs.' Mem. in Supp. of Mot. to Dismiss, Ex. A) Some of Defendants' trades were accomplished through voice brokers, many of whom are located in Houston. (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 7.) The propane at issue is stored in Mont Belvieu storage facilities outside of Houston; if witnesses are needed to testify about propane delivery resulting from Defendants' trades, they would be located at this facility. (*Id.*) As Defendants point out, many of these Houston-based witnesses are third parties with little or no stake in this case. (*Id.*)

---

[12] This brings into question the government's assumption that Defendants will agree to certain stipulations, upon which the government is apparently basing its tentative witness list. The government estimates that the trial would last approximately three weeks. (*See* R. 79, Gov't Resp. to Mot. to Transfer at 11 n.9.) Defendants' motion suggests that the trial may well last longer: "This will not be a three-week trial with only a handful of witnesses. Rather, because of the factual and legal complexities interwoven with pivotal Houston-based activities, this case will require many more witnesses than the government discusses . . . ." (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 2.)

[13] Defendants assert that they are awaiting discovery from the government related to the counter-parties, and that when this information is received they will have more complete information about the location of these third-party witnesses. (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 7 n.6.)

Defendants also assert that their character witnesses will be from Houston. (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 10.) In cases involving fraud, where "the *mens rea* of the defendants and their general character will be of some consequence," the location and availability of character witnesses is an important consideration. *See United States v. Fassnacht*, No. 01-63, 2002 WL 63523, at *3 (N.D. Ill. Jan. 15, 2002); *see also United States v. Ferguson*, 432 F. Supp. 2d 559, 564 (E.D. Va. 2006) (fact that majority of defendant's character witnesses were located in Connecticut weighed in favor of transfer). As one Supreme Court justice noted years ago:

> Very often the difference between liberty and imprisonment in cases where the direct evidence offered by the government and the defendant is evenly balanced depends upon the presence of character witnesses . . . . The inconvenience, expense and loss of time involved in transplanting these witnesses to testify in trials far removed from their homes are often too great to warrant their use. Moreover, they are likely to lose much of their effectiveness before a distant jury that knows nothing of their reputations.

*United States v. Johnson*, 323 U.S. 273, 279 (1944) (Murphy, J., concurring). While interstate travel has become considerably easier since the time of that observation, these concerns are still worthy of consideration.

In summary, at this stage it appears that there are potential witnesses located in both Chicago and Houston, as well as other parts of the country and the world. As our colleague Judge Shadur has noted, "It is really impossible, without conducting a kind of pre-trial mini-trial, to evaluate the significance of the prospective witnesses to see in what direction this factor points." *United States v. Bein*, 539 F. Supp. 72, 74 (N.D. Ill. 1982). Nevertheless, if the parties cannot reach stipulations about Defendants' Houston-based activities, it appears that many

Houston-based fact witnesses with personal knowledge of these events may become necessary.[14] *See Ferguson*, 432 F. Supp. 2d at 564-65 (transferring case from Virginia to Connecticut, even though government case agents were located in and around Washington, D.C., because bulk of eyewitnesses with personal knowledge of the events were located in Connecticut). Many of these witnesses are likely to be third parties with little or no stake in this case, who would be significantly more inconvenienced by having to travel to Chicago for a trial. *See Lima*, 1995 WL 348105, at *3 (even though government's primary witness was from Chicago, factor weighed in favor of transfer because numerous fact witnesses were located in New Jersey, and "[i]t makes more sense to fly one Chicago witness to New Jersey to testify for five days than to fly eight New Jersey witnesses to Chicago to testify for a few hours."). The Court concludes that this second factor also weighs in favor of a transfer.

### 3. Location of Events Likely To Be In Issue

Most of the events underlying the Indictment occurred in Houston: Defendants lived in Houston and worked on the NGL Trading Bench in Houston; their trades were initiated in Houston, and in some instances were made with other brokers located in Houston; and the electronic trading board that Defendants allegedly used as a means of conducting their activities in secret is owned and maintained by a company in Houston. While there is a connection to this District sufficient to satisfy constitutional venue requirements, *see supra* Part I, many of the events underlying the Indictment occurred in Houston or were directed by the Defendants from

---

[14] Defendants provide a list of 13 different witnesses who worked on or with the NGL Trading Bench during the relevant period, 11 of whom are believed to still be in Houston. (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 6 n.4 & Ex. A.) The CFTC deposed these individuals as part of the companion civil case. (*Id.* at 6.)

Houston. *See Lima*, 1995 WL 348105, at \*2 (transferring case where "hub" of conspiracy was in New Jersey, whereas Illinois connection was "one spoke"); *United States v. Ringer*, 651 F. Supp. 636, 638 (N.D. Ill. 1986) (transferring case to New York, where indictment had connection to Chicago, but bulk of events either occurred in New York or were directed from New York by defendants). Defendants are alleged to have committed numerous acts in Houston in furtherance of their scheme, including: gathering information to determine whether the TET propane market was ripe for manipulation; devising their scheme to manipulate the market; purchasing large amounts of TET propane to gain control over the supply; using improper bidding tactics to mislead the market about the supply of TET propane; and causing BP to accept delivery of approximately four million barrels of February 2004 TET propane at the TEPPCO facility outside of Houston. (R. 1, Indictment ¶¶ 18-49.)

The government is correct that Defendants conducted business in this District and, among other things, signed agreements on behalf of Chicago-based BP entities, used funds from a Chicago-based BP company to make their trades, and had other parties wire funds to a BP bank account in Chicago. Nevertheless, it is not apparent that these events are the ones likely to be at issue, since the trades themselves and the wire-transfers they precipitated can be documented and would thus be difficult to dispute. The Court finds it more likely that one of the key issues at trial will be Defendants' intent in conducting their various activities, in other words, whether they were acting innocently or whether they intended to corner the TET propane market. *See Frey*, 931 F.2d at 1175; *see also* Markham, *supra*, at 283-84 (observing that critical issue in market manipulation case is whether prices were inflated through intentional conduct of the defendants or through other forces). That intent was allegedly formed in Houston and revealed

19

itself in conversations that allegedly occurred there. The parties and eyewitnesses to these conversations and other events demonstrating Defendants' intent are likely to be located in Houston. On balance, the Court finds that this factor weighs strongly in favor of a transfer.

### 4. Location of Documents and Records Likely to be Involved

The bulk of the government's discovery has been produced to Defendants in electronic form. (R. 79, Gov't Resp. to Defs.' Mot. to Transfer at 9-10.) Where the government's documents have been computerized, this factor is essentially neutral. *See United States v. Lewis*, No. 04-403, 2006 WL 1579855, at *14 (D. Minn. Jun. 1, 2006). The government also points out that no documents obtained in its investigation were ever kept in Houston, and instead were kept in Chicago and Washington D.C. (R. 79, Gov't Resp. to Mot. to Transfer at 10 n. 7.) The location of at least some of the government's documents in this District weighs against a transfer. *See Zylstra*, 713 F.2d at 1337. On the other hand, Defendants predict that their own investigations in preparation for trial may involve obtaining documents and records in locations in and around Houston, including the TET storage facility in Mont Belvieu. (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 13-14.) Although Defendants do not elaborate on the precise documents and records to which they are referring, the Court does not find this prediction unreasonable given that, as stated above, much of the Defendants' alleged illegal conduct was centered in Houston. Considering the arguments advanced by both parties, the Court finds this factor to be closely balanced.

### 5. Possible Disruption of Defendants' Business Unless Case Is Transferred

Only Summers asserts an argument with respect to this factor. He states that he has a "fledgling" solar energy consulting business, which is presently the sole means of support for his

family. (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 7-8.) He asserts that the business will essentially come to a standstill if he is in Chicago for several weeks at trial. (*Id.* at 8.) The government responds that the Court should disregard Summers' argument because he has not provided any description of his activities with respect to his consulting business.[15] (R. 79, Gov't Resp. to Mot. to Transfer at 4, 10.) Other courts have noted that "it is not unreasonable to assume that a long trial far from a defendant's place of business may jeopardize his or her livelihood." *Ringer*, 651 F. Supp. at 638 (declining to reject defendant's allegations of disruption to his business, which government argued were "self-serving" and "unsubstantiated."). In the case of an ordinary business, which requires the defendant's presence in a specific office or other location, this factor warrants against holding the trial in a distant city. *See Fassnacht*, 2002 WL 63523, at *4 (factor weighed in favor of transfer because "[a] few hours each weekday plus weekends could make a substantial difference to [defendant's] business"); *United States v. Aronoff*, 463 F. Supp. 454, 459 (S.D.N.Y. 1978) (transfer would allow defendant to use evenings

---

[15] The government also raises a general argument that this Court should reject all of Defendants' arguments because they have not provided evidentiary support with their motion. (*See* R. 79, Gov't Resp. to Def.'s Mot. to Transfer at 4.) Contrary to the government's argument, the case it cites does not stand for the principle that documentary evidence must be submitted with a motion to transfer; it holds that the party opposing transfer must be given an opportunity to rebut the arguments "and evidence, if any," offered by the party seeking a transfer. (*See id.*) (citing *In re United States*, 273 F.3d 380, 387 (3d Cir. 2001).) The government has been given that opportunity in this case. While the parties could have submitted affidavits in support of their respective positions, *see* Fed. R. Crim. P. 47(b), neither side elected to do so. In assessing the relative hardships, this Court has accepted the assertions made in writing by the attorneys, who are officers of the Court, and who have a duty to speak truthfully in their submissions to this Court. *See* Local Rule 83.53.1-83.53.3; Local Rule 83.58.4; *see also United States v. Payne*, No. 03-398, 2004 WL 1879993, at *5 (N.D. Ill. Aug. 12, 2004) (finding attorney guilty of criminal contempt under 18 U.S.C. § 401 for making false assertions to the Court in violation of Local Rules). Moreover, the facts pertaining to the relative hardships do not appear to be in dispute, and some are apparent from the face of the Indictment or other court records.

and weekends to maintain his business). Here, however, Summers describes his work as a

"consulting" business; without more details from Summers as to the nature of his business, it is

difficult to assess whether he must be present in Houston to perform this work, or whether he

could feasibly continue his work via computer and telephone from Chicago. Based on the

documents before the Court, this factor weighs slightly in favor of a transfer, and even then, only

as to one of the four Defendants.

### 6.    Expense To The Parties

Defendants argue that a trial in Chicago would be very costly to them, as they would be

required to pay lodging, food, and airfare for themselves, their family, and their witnesses. (R.

61, Defs.' Mem. in Supp. of Mot. to Transfer at 10-11.) Travel and lodging expenses for the

defendants "are an obvious factor to be considered in determining the balance of inconvenience

to the parties." *Ferguson*, 432 F. Supp.2d at 567. On the other hand, the government argues that

it would incur significant costs if the trial were held in Houston, because two of the three

government case agents live in Chicago, and the government would have to pay their travel,

lodging, and other expenses for the entirety of the trial. (R. 79, Gov't Resp. at 11.) In balancing

this factor, other courts have recognized that the government has "for all practical purposes,

unlimited financial resources to bring to bear" in the prosecution of its case. *See Ferguson*, 432

F. Supp. 2d at 567 (finding government better able to bear expense of trial in distant city, even

though Defendants had significant financial means). Nevertheless, this Court does not take

lightly the additional costs to the government created by a transfer, since these costs ultimately

must be borne by the taxpayers. *See United States v. Lopez*, 343 F. Supp. 2d 824, 837 (E.D. Mo.

2004) (finding factor closely balanced where transfer would require government to transport at

least four witnesses and a prosecutor to distant city). On the whole, the Court finds this factor supports transfer because defendants do not have the same resources to support an extended trial in Chicago.

### 7. Location of Counsel

Three principal defense counsel have their offices in Houston, and the others are located in California and Washington D.C. (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 10.) Defendants have local counsel in Chicago, but they assert that these attorneys were only hired because the case is currently pending here, and that they would no longer be involved if the case were transferred. (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 9-10.) The government has three prosecutors assigned to this case. Two are based in Chicago, and the third is based in Washington D.C. (R. 79, Gov't Resp. to Mot. to Transfer at 11 n. 10.) The government will have to pay the travel expenses of the Washington D.C.-based prosecutor in any event, but a trial in Houston would create additional expenses for the two other prosecutors. (*Id.* at 11.) Again, the Court does not take these costs lightly, given that they must ultimately be borne by the taxpayers. Nevertheless, the Court also considers that in the event of a transfer, the prosecutors would likely have support services and other resources available to them from the offices of the United States Attorney for the Southern District of Texas. *See Lopez*, 343 F. Supp. 2d at 837. On the whole, the Court finds this factor to be closely balanced.

### 8. Relative Accessibility of Place of Trial

Defendants argue that Houston is more accessible to Defendants and their Houston-based witnesses, but they do not address accessibility by others who are located outside of Houston. (R. 61, Defs.' Mem. in Supp. of Mot. to Transfer at 11.) The government argues that Chicago is

"significantly more convenient" for all involved because it is "a major metropolitan area with world-class transportation facilities." (R. 79, Gov't Resp. to Mot. to Transfer at 12.) Although Chicago may be more centrally located in terms of geography, Houston and Chicago are both major metropolitan areas, and the Court finds this factor to be essentially neutral.[16] *See Fassnacht*, 2002 WL 63523, at *4 (factor neutral because Chicago and Philadelphia are both metropolitan areas with easy access to commercial transportation); *Ringer*, 651 F. Supp. at 640 (factor neutral as between Chicago and New York); *Bein*, 539 F. Supp. at 75 ("This factor drops out of consideration where, as here, two major metropolitan areas are involved.").

### 9.    Docket Condition of Each District Involved

Numerous courts have held that after the adoption of the Speedy Trial Act of 1974, the relative conditions of the courts' dockets are of minimal significance. *See Ringer*, 651 F. Supp. at 640; *Bein*, 539 F. Supp. at 75; *United States v. Berry*, No. 84-529, 1985 WL 1587, at *10 (N.D. Ill. May 10, 1985). Assuming this factor still warrants any consideration, the Court is aware that the Southern District of Texas is a busy District, as the government points out. (R. 79, Gov't Resp. to Mot. to Transfer at 13-14.) That District has a high criminal caseload, comprised

---

[16] Houston is the nation's fourth largest city and home to more than 2 million people. *See* http://en.wikipedia.org/wiki/Houston_Texas. Houston is served by two commercial airports, which together served 52 million passengers in 2007, and is the headquarters of Continental Airlines, which offers more than 700 daily departures from Houston. *See id.*

24

significantly of immigration related offenses, due to its proximity to the U.S.-Mexico border.[17]
*See* www.uscourts.gov/caseload2007/tables.D03CMar07.pdf. Nevertheless, the Northern

District of Illinois is also a busy District. *See id.* In fact, our District is often made to use its

resources on long criminal trials which exceed an eight-week period. This Court is aware of no

reason why the judges of the Southern District of Texas could not accommodate and handle this

case as competently as this Court could. This Court has great respect for its colleagues in the

Southern District of Texas, and has no false illusions that this District's criminal work is more

complicated in any fashion. On balance, the Court finds this factor neutral.

### 10. Other Considerations

In arguing against transfer, the government raises an additional concern: that venue

would not be proper in the Southern District of Texas for the wire fraud counts. (R. 79, Govt's

Resp. to Mot. to Transfer at 4, 9 n. 6.) Defendants disagree, and state, "Venue is appropriate in

the Southern District of Texas for each count of the Indictment." (R. 81, Defs.' Reply in Supp.

of Mot. to Transfer at 5.) The Court agrees with Defendants. Continuing offenses may be

prosecuted in any District in which the offense was "begun, continued, or completed." 18 U.S.C.

§ 3237. Numerous courts have held that wire fraud is a continuing offense. *See, e.g., United*

---

[17] Defendants asserts that the Southern District of Texas has a fast-track program in order
to deal with the large numbers of immigration offenses on its docket, but this is not entirely
accurate. (R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 10.) "Fast-tracking" refers to a
procedure that originated in states along the U.S.-Mexico border, where district courts
experienced high caseloads of immigration offenses. Congress authorized fast-track programs,
whereby defendants can get an added sentencing reduction if they plead guilty early in the
proceedings, to help prosecutors and judges reduce their caseloads. *U.S. v. Rodriguez-Rodriguez*,
453 F.3d 458, 462-63 (7th Cir. 2006). Although certain divisions within the Southern District of
Texas have fast-track programs, the Houston Division does not. *See U.S. v. Escobar-Rico*, No.
05-0444, 2007 WL 3143711, at *4 (S.D. Tex. Oct. 24, 2007); *U.S. v. Luna*, 05-0053, 2007 WL
3125295, at *4 (S.D. Tex. Oct. 23, 2007).

*States v. Pearson*, 340 F.3d 459, 466-67 (7th Cir. 2003) (applying Section 3237 to wire fraud

charge), *rev'd on other grounds by Hawkins v. United States*, 543 U.S. 1097 (2005); *United*

*States v. Ebersole*, 411 F.3d 517, 527 (4th Cir. 2005) (wire fraud is a continuing offense); *United*

*States v. Kim*, 246 F.3d 186, 192-93 (2d Cir. 2001) (same). As stated above, venue under Section

3237 may be proper in several different Districts, and will only be improper in a particular

District if the acts that occurred in that District do not provide evidence of the elements of the

crime charged. *Ringer*, 300 F.3d at 792; *Ochoa*, 229 F.3d at 636. The elements of wire fraud

are: (1) a scheme to defraud; (2) intent to defraud; and (3) use of the wires in furtherance of the

scheme. *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007). Defendants' wire fraud

offenses began in Houston, where they allegedly devised their alleged scheme to defraud, formed

their intent to corner the TET propane market, and made the trades that precipitated the wire

transfers at issue. *See Pearson*, 340 F.3d at 466 (venue proper on wire fraud count in Southern

District of Illinois, where defendants' conduct provided evidence of intent to defraud, even

though wire transfer forming basis for that count did not originate in, pass through, or terminate

in that District). Thus, venue would be proper in Houston for the wire fraud offenses.[18]

It is not clear whether the government has the same concern about the conspiracy count,

but for the sake of completeness the Court briefly addresses this issue. Venue would be proper in

Houston for the conspiracy count, because "a conspiracy charge may be tried in any district in

---

[18] This Court agrees with Defendants that the cases cited by the government stand for the
proposition that wire fraud charges *may* be tried in a district where a payment-related wire
communication was transmitted, not that they *must* be tried in such a district. (*See* R. 79, Gov't
Resp. to Def.'s Mot. to Transfer at 5; R. 81, Defs.' Reply in Supp. of Mot. to Transfer at 5 n.3.)
For continuing offenses like wire fraud, venue may be appropriate in multiple locations. *See* 18
U.S.C. § 3237; *Pearson*, 340 F.3d at 462.

which an overt act of the conspiracy occurred." *Ochoa*, 229 F.3d at 636; *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985) ("As long as one overt act in furtherance of the conspiracy was committed in a district, venue is proper there."). Defendants are alleged to have committed numerous overt acts in Houston in furtherance of the conspiracy, including: gathering information to determine whether the TET propane market was ripe for manipulation; devising their scheme to manipulate the market; purchasing large amounts of TET propane to gain control over the supply; using improper bidding tactics to mislead the market about the supply of TET propane; and causing BP to accept delivery of approximately four million barrels of February 2004 TET propane at the TEPPCO facility outside of Houston. (R. 1, Indictment ¶¶ 18-49.) Thus, venue on the conspiracy count would be proper in the Southern District of Texas.

Based on a consideration of all the relevant factors, whether to transfer does not yield a ready-made answer. The Court has given significant consideration to the reasons advanced by the government for maintaining this novel and important case here. However, the Court finds that these governmental interests are outweighed by the undeniable fact that Houston was the "hub" of much of Defendants' alleged illegal conduct. The Court has also considered the significant inconvenience and cost that would be posed to Defendants and their families, as well as any third-party witnesses located in Houston, if the trial (which, in this Court's view, is not likely to be nearly as quick or straightforward as the government predicts) were held in Chicago. This Court concludes that "all relevant things considered, the case would be better off transferred to another district." *Balismo*, 68 F.3d at 186. For these reasons, the Court must exercise its discretion and transfer this case to the Southern District of Texas.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (R. 62) is denied.

Defendants' motion to transfer (R. 59) is granted. This case is transferred to the United States

District Court for the Southern District of Texas pursuant to Federal Rule of Civil Procedure

21(b).

ENTERED: _Ruben Castillo_
Judge Ruben Castillo
United States District Court

Dated: June 11, 2008

28